IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SUNBELT RENTALS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-3241-N |
| | § | |
| JIMMY HOLLEY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

This Order addresses Plaintiff Sunbelt Rentals, Inc.'s ("Sunbelt") motion for a preliminary injunction. Sunbelt has demonstrated, as to a portion of its claim, a substantial likelihood of succeeding on the merits of its breach of contract and misappropriation of trade secrets claims, has shown that irreparable harm will result if the Court fails to enjoin defendant Jimmy Holley's conduct, that the balance of harms favors Sunbelt, and that issuing the injunction will not adversely affect the public interest. Accordingly, the Court grants in part and denies in part Sunbelt's motion for a preliminary injunction.

I. THE ORIGINS OF THE DISPUTE

Sunbelt rents heavy equipment and accessories to institutional and retail customers. Pl.'s Compl. ¶¶ 16–17 [1]. Holley worked at Sunbelt for over twenty years. *Id.* at ¶30. For over a decade before he left the company last year, Holley served as a salesman, primarily covering institutional accounts. *Id.* at ¶¶ 19, 31–32.

During his employment with Sunbelt, Holley signed an employment agreement that contained various restrictive covenants. *Id.* at ¶ 34. In pertinent part, these read:

> 6.1    During the term of this Agreement and for a period of twelve (12) months after the date of the expiration or termination of this Agreement based on Employee's voluntary resignation or Employee's termination of employment by Corporation (the "Restrictive Period"), Employee shall not directly or indirectly:
>
> . . . .
>
> (ii)    solicit the provision of products or services, similar to those provided by Corporation at the "Designated Stores" (as defined below), to any person or entity who purchased or leased products or services from Corporation at any time during the twelve (12) calendar months immediately preceding the termination or expiration of this Agreement for any reason and for or with whom Employee had contact, responsibility or access to Confidential Information related to such person or entity; provided, however, the restrictions of this subsection (ii) shall be limited in scope to the "Territory" (as defined below) and to any office, store or other place of business in which, or in connection with which, Employee has had business contact with such persons or entities during the twelve (12) calendar months immediately preceding the termination or expiration of this Agreement for any reason.
>
> . . . .
>
> (iv)    compete with the Corporation, its successors and assigns by engaging, directly or indirectly, in the Business as conducted at the Designated Stores or in a business substantially similar to the Business as conducted at the Designated Stores, within the "Territory," as hereinafter defined; or
>
> (v)    provide information to, solicit or sell for, organize or own any interest in (either directly or through any parent, affiliate, or subsidiary corporation, partnership, or other entity), or become employed or engaged by, or act as agent for any person, corporation, or other entity that is directly or indirectly engaged in a business in the "Territory", as hereinafter defined, which is substantially similar to the Business as conducted at the Designated Stores or competitive with Corporation's Business as conducted at the Designated Stores[.]

Ex. A to Pl.'s Compl. ("Employment Agreement") 4 [1-1]. The agreement defined "Business" as:

ORDER – PAGE 2

> (i) selling and renting equipment, tools, scaffolding and parts for use in the manufacturing, industrial and construction industries, (ii) selling and renting tools and homeowner repair equipment to retail customers, and (iii) the provision of related services including the erecting and dismantling of scaffolding . . . .

*Id.* The restrictions extended fifty miles from any store "in which, or in connection with which," Holley generated sales in the year preceding his departure. *Id.*

Holley testifies that he became insecure in his standing with Sunbelt and sought alternative employment. Ex. 3 Pl.'s App. Supp. Mot. TRO 32:20–33:6, 45:1–47:14 [25]. The record is not entirely clear, but it appears that over the course of last summer Holley engaged in a series of discussions with a contact at a Sunbelt competitor, EquipmentShare.com ("Equipment Share"). *Id.* at 28:10–30:12. He resigned from Sunbelt last August and began a new job with Equipment Share the next month, purportedly based at Equipment Share's Ardmore, Oklahoma store. *See id.* at 115:19–22, 118:21–119:1.

Sunbelt sued Holley in this Court late last year, alleging that he has actively solicited former customers and worked on behalf of Equipment Share within the area covered by the nonsolicitation and noncompetition of the employment agreement. Further, Sunbelt seeks relief for the alleged theft and misuse of trade secret information with which Sunbelt entrusted Holley. Sunbelt quickly moved for a preliminary injunction, and the Court issued a Scheduling Order laying out a timeline for expedited discovery and briefing.

Pursuant to that Order, Sunbelt deposed Holley. He admitted to facilitating equipment rentals to various former clients within fifty miles of his primary Sunbelt location in Lewisville, Texas. *See, e.g., id.* at 195:10–23, 208:24–209:21, 217:20–24, 223:17–224:9, 231:4–232:25. Sunbelt thereafter sought and obtained a temporary

ORDER – PAGE 3

restraining order enjoining Holley from "directly or indirectly selling or renting" thirteen enumerated categories of equipment within fifty miles of Sunbelt's Lewisville, Texas location. Sunbelt now seeks a preliminary injunction that continues the limitation imposed by the TRO while also enjoining Holley from conduct violating the nonsolicitation clause of his employment contract and from using Sunbelt's allegedly trade secret information.

## II. LEGAL STANDARD FOR A PRELIMINARY INUNCTION

The Fifth Circuit set out the requirements for a preliminary injunction in *Canal Authority of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). To prevail on a preliminary injunction application, the movant must show (1) a substantial likelihood that the movant will ultimately prevail on the merits, (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) that granting the injunction is not adverse to the public interest. *Id.*; *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

To qualify for a preliminary injunction, the movant must clearly carry the burden of persuasion with respect to all four requirements. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). A movant who obtains a preliminary injunction must post a bond to secure the nonmovant against any wrongful damages it suffers as a result of the injunction. FED. R. CIV. P. 65(c).

ORDER – PAGE 4

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Callaway*, 489 F.2d at 572). A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). Even when a movant satisfies each of the four *Callaway* factors, the decision of whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light*, 760 F.2d at 621.

### III.  SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### *A.  Breach of Restrictive Covenants*

In its Order addressing Sunbelt's request for a TRO, the Court held that adequate consideration made the employment agreement enforceable and that the restrictive covenants did not impose unreasonable limitations on Holley's post-employment conduct. The Court further concluded that Sunbelt had succeeded in demonstrating a substantial likelihood of success on the merits of its claim that Holley breached the noncompetition provisions of the restrictive covenants. Because nothing has changed to alter that analysis, the Court adopts it in full. Accordingly, the Court concludes that Sunbelt has shown a substantial likelihood of succeeding on its breach of contract claim as it pertains to Holley's breach of the noncompetition clauses in the employment agreement.

The Court next turns to whether Sunbelt has identified evidence sufficient to carry its burden with respect to its breach of contract claim predicated on Holley's alleged violation of the nonsolicitation clause.

The parties disagree about the type of conduct that constitutes solicitation under the meaning of the agreement and thus whether the evidence supports a substantial likelihood of Sunbelt demonstrating a breach of the nonsolicitation clause. Holley acknowledges that, as written, the restrictive covenants prohibit him from "solicit[ing] the provision" of equipment (by lease or sale) of the type Sunbelt rents and sells, Employment Agreement ¶ 6(ii), but contends that the verb "solicit" requires a showing of active conduct. In Holley's telling, his testimony goes only so far as to show that he contacted certain accounts shortly after he left Sunbelt to inform them of his departure. Providing services to customers who initiated contact with him — while potentially violative of the noncompete clause — does not constitute solicitation. Sunbelt counters that the term solicit may embrace a wider swath of conduct and that Holley's admissions provide context to his conversations with his clients that enable an inference that Holley had engaged in a transparent ploy to induce his clients to quickly reach out to him at his new employer.

The Court largely agrees with Sunbelt's construction. Post-employment contact with former clients can be thought of as falling on a spectrum from active communication directed by the employee and designed to culminate in new business at one end, to requests instigated entirely at the will of the former client at the other. In between lie various factual scenarios involving indirect solicitation or some act undertaken in the hopes of inducing a former client to "initiate" contact. A reasonable construction of a nonsolicitation clause

ORDER – PAGE 6

must embrace more conduct than that falling at the most extreme end of the spectrum because adopting such a restricted reading of a nonsolicitation agreement would subject such clauses to transparent gamesmanship capable of rendering them mere nullities. The Fort Worth Court of Appeals has endorsed the proposition that facts falling in the middle of this spectrum *may* support a valid inference that the promisee has violated a nonsolicitation agreement. *See Hernandez v. Combined Ins. Co. of Am.*, 2021 WL 520456, at *15–17 (Tex. App.—Fort Worth Feb. 11, 2021, no pet.) (discussing evidence available to trial court at temporary injunction stage and concluding it could support an inference of solicitation absent direct evidence of prohibited communications initiated by the promisee). The Fort Worth court's conclusion does not directly conflict with the primary authority relied on by Holley; in that case the court concluded that the available evidence would not support an inference of solicitation because it showed only that *clients* had sought out and initiated contact with the former-employee defendants. *Safeworks, LLC v. Max Access, Inc.*, 2009 WL 959969, at *6 (S.D. Tex. April 8, 2009). In other words, the record before the court in *Safeworks* lacked any evidence that the former employees had taken *any* action either to solicit former clients directly or to indirectly induce the clients to initiate conversations. For this reason, the available evidence in the two cases provides a straightforward ground for reconciling the seemingly inconsistent holdings. The question remains, however, whether the facts in this case merit an inference that Holley likely breached his nonsolicitation agreement.

      Comparing the available evidence in this case to that in *Hernandez*, the Court declines to draw the inference that Holley likely violated the terms of the nonsolicitation

ORDER – PAGE 7

restriction. *Hernandez* involved the likely breach of a nonsolicitation clause that prohibited the promisee from soliciting the employer's *employees* for a set period. *Hernandez*, 2021 WL 520456, at *13. The defendant had served as a manager of a team of insurance salespersons and had chosen to decamp to a different insurer. *Id.* at *2. A litany of bad facts worked against the defendant: He convened a meeting to announce his resignation at which two representatives of his new employer were present; the representatives began a presentation regarding the defendant's new company as soon as the defendant departed the meeting and conducted a question-and-answer session after the presentation concluded; documentary evidence suggested coordination of effort between the defendant and the representatives; and the insurance company demonstrated that a high proportion of the defendant's new sales team consisted of agents from his former employer. *Id.* at *15–16. Even though the appellate court conceded that the "evidence of solicitation and inducement offered at the injunction hearing was hardly overwhelming," a holistic appraisal of these facts permitted the trial court to draw an inference of solicitation without abusing its discretion. *Id.* at *13, 17.

The available evidence in this case does not reach the level of *Hernandez*, and the Court declines to draw the inferences necessary for Sunbelt to obtain an injunction. Without doubt, Holley's deposition testimony discloses bad facts: He waited until after he had resigned from Sunbelt (and signed an employment agreement with Equipment Share) to contact his former customers and when he did so, he made the contacts via his personal cellphone. Ex. 8 to Pl.'s App. Br. Supp. Prelim. Inj. 11:23–13:20 [38] Nevertheless, he also testified that he communicated the contact information of the person at Sunbelt who

ORDER – PAGE 8

would handle the account going forward. *Id.* at 11:23–12:8. He denied providing any of the clients the name of his new employer or explain what he would be doing next. Ex. 4 to Pl.'s App. Br. Supp. Prelim. Inj. 186:14–18 [33]. Holley's testimony also suggests that he shares long term personal relationships with his contacts at several of the clients, supporting a countervailing inference that he did not feel the need to solicit them because he expected they would seek him out in short order. *See, e.g., id.* at 187:11–16; 220:24:–221:3; 230:14–17. While these facts make the issue a close one, the Court concludes that it should decline to draw the inferences Sunbelt requests, in light of how close the issue is and the extraordinary nature of the relief sought. Accordingly, the Court declines to hold that Sunbelt has shown a substantial likelihood of prevailing on its breach of contract claim with respect to the nonsolicitation provision of the restrictive covenants.

### B. Misappropriation of Trade Secrets

To establish a violation of TUTSA, a plaintiff must show: (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) use of the trade secret without authorization from the plaintiff. *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 600 (5th Cir. 2015); *see also Miller v. Talley Dunn Gallery, LLC*, 2016 WL 836775, at *12 (Tex. App. – Dallas Mar. 3, 2016, no pet.). TUTSA defines trade secret as "information" that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(6);

ORDER – PAGE 9

*see also Baxter & Assocs., LLC v. D & D Elevators, Inc.*, 2017 WL 604043, at *6 (Tex. App. – Dallas Feb. 15, 2017, no pet.). In the context of a preliminary injunction application, "the trial court does not decide whether the information sought to be protected is a trade secret. Rather, it determines whether the applicant has established the information is entitled to trade secret protection until a trial on the merits." *Talley Dunn Gallery*, 2016 WL 836775, at *12.

At least some of the information that Holley forwarded to his personal email account deserves trade secret protection. In particular, the customer-specific pricing information likely qualifies as trade secret. First, Sunbelt took reasonable steps to protect the confidentiality of the customer-specific rates it set pursuant to agreements with institutional clients. It subjected its employees to confidentiality obligations. Employment Agreement ¶ 5; Ex. 3 to Pl.'s App. Supp. Mot. Preliminary Inj. 93:19–96:11[33]; Ex. 4 to Pl.'s App. Supp. Mot. Preliminary Inj. at 9. Likewise, the evidence shows that Sunbelt imposed confidentiality limitations on its clients by contract. Ex. 12 to Pl.'s App. Supp. Mot. Preliminary Inj. at 424–27, 430–31 [38]; Ex. 3 to Pl.'s App. Supp. Mot. Preliminary Inj. 101:4–11. Second, in his deposition, Holley twice conceded that this type of information would have value in the hands of a Sunbelt competitor. Ex. 3 to Pl's App. Supp. Mot. Preliminary Inj. 107:3–7; 168:13–16. Finally, Holley's act of forwarding customer-specific pricing for key accounts to his personal email in the days before he departed suggests that the information could not be easily reproduced from memory nor obtained by legitimate means. *See, e.g.* Ex. 6 to Pl.'s App. Supp. Mot. Preliminary Inj. (detailing some of the material forwarded to Holley's personal email address).

ORDER – PAGE 10

Holley obtained this information through a breach of a confidential relationship. The evidence shows that Holley had, on several occasions, acknowledged his duty to protect the confidentiality of certain categories of information, including customer-specific pricing. Employment Agreement ¶ 5; Ex. 3 to Pl.'s App. Supp. Mot. Preliminary Inj. 93:19–96:11. Shortly before resigning his employment with Sunbelt, Holley emailed pricing information for multiple large accounts from his employer-provided email to a personal account and a personal account apparently belonging to his wife. This conduct constitutes a breach of the confidentiality obligation to Sunbelt found in the employment agreement and acknowledged at subsequent times during Holley's employment.

Finally, the evidence supports an inference of unauthorized use sufficient for Sunbelt to prevail at this stage. The information would have value for someone looking to compete with Sunbelt for business with the firms whose pricing was forwarded. Since his departure from Sunbelt, Holley has held a nearly identical sales role at a competing business. Activity between the account apparently belonging to Holley's wife and Holley's own personal email account suggests that Holley was accessing some of this information in the weeks following his departure from Sunbelt (after beginning employment with Equipment Share). Taken together with the documented reduction in Sunbelt's business with certain accounts (and Holley's admission that he had begun doing business with these clients) the Court agrees that under "these circumstances, it is probable" that Holley will use (or already has used) the information to his benefit. *Rugen v. Interactive Bus. Sys.*, 864

S.W.2d 548, 552 (Tex. App.—Dallas 1993). Thus, Sunbelt has shown a substantial likelihood of prevailing on its TUTSA claim.[1]

As for the other types of information identified by Sunbelt, the Court concludes that it has not carried its burden. Assuming for the sake of argument that the customer lists and jobsite information qualify for trade secret protection, Sunbelt identifies no evidence giving rise to an inference that Holley has used this information to gain an unfair competitive edge. Holley's deposition suggests that the business he has engaged in with former clients has largely flowed through preexisting contacts, not by travelling to jobsites contained in the lists he forwarded to himself. Sunbelt has adduced not evidence that Holley has sought to use its customer lists to expand his business. The crux of Sunbelt's complaint is that Holley has violated his restrictive covenants by engaging in substantial business with his own former clients in the territory he used to cover for Sunbelt. Surely Holley did not need a list to remember a small number of major clients with whom he has done substantial business for over a decade. Accordingly, the Court will grant only a limited injunction on the trade secrets claims, cabined only to the type of information as to which Sunbelt has carried its burden of showing a substantial likelihood of success on the merits.

### IV. IRREPARABLE HARM

"Under Texas law, covenants not to compete present the paradigm of irreparable injury, so that reasonable enforcement appears to be the rule rather than the exception."

---

[1] **Error! Main Document Only.** Because the Court determines that Sunbelt has carried its burden for preliminary injunction on its trade secret misappropriation claim under TUTSA, the Court need not — and does not — assess the merits of the same claim under DTSA.

ORDER – PAGE 12

*Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1354 (N.D. Tex. 1991) *aff'd* 948 F.2d 1286 (5th Cir. 1991). Sunbelt alleges, and Holley admitted under oath, that customers who previously accounted for millions of dollars of revenue have followed Holley to a competitor. Texas courts have long recognized that the disclosure of trade secret information constitutes irreparable injury as a matter of law. *Williams v. Compressor Engineering Corp.*, 704 S.W.2d 469, 470–71 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Sunbelt has established that absent an injunction, it will likely suffer irreparable harm.

## V.  BALANCE OF HARMS

Sunbelt will suffer greater harm if the Court does not issue the injunction than Holley will endure if the Court does grant relief. Continued violation of the agreement will impose substantial impairment of Sunbelt's goodwill, precisely the interest it sought to protect by means of the restrictive covenants and confidentiality obligation. Enforcing this agreement will limit Holley's sales activities, but not unreasonably. He can continue to work outside of the area defined in the restrictive covenants. This limitation should not impose substantial hardship — his current employment arrangement is assertedly based in Ardmore, Oklahoma. Moreover, the burden imposed by a temporary injunction goes no further than the terms to which Holley voluntarily consented.

## VI.  PUBLIC INTEREST

Enforcement of restrictive covenants implicates a sensitive balancing of public interests between the mobility of employees and the capacity of employers to protect their investment in human capital. These public interest considerations, however, have become

ORDER – PAGE 13

subsumed into the substantive law that determines when a court will uphold a restrictive covenant. As such, the Court has already addressed these considerations in its foregoing analysis on the likelihood of Sunbelt's succeeding on the merits. Beyond the concerns already reflected in Chapter 15 of the Texas Business and Commerce Code, the public has an interest in the enforcement of valid contracts. *See, e.g.*, *CyberX Grp., LLC v. Pearson*, 2021 WL 1966813, at *12 (N.D. Tex. May 17, 2021). To that end, the Court concludes that enforcing the nondisclosure of Sunbelt's trade secret information is in the public interest. As such, the Court concludes that enforcement of this agreement by way of preliminary injunction will serve the public interest.

## CONCLUSION

For the forgoing reasons, the Court concludes that Sunbelt has met its burden to obtain a preliminary injunction as to some of its claims. Accordingly, the Court grants in part and denies in part the motion for a preliminary injunction.

Signed April 7, 2022.

_____
David C. Godbey
United States District Judge